IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| **MICHAEL A., JR.** | |
| **Plaintiff,** | **CIVIL ACTION NO.** <br> **1:20-CV-1184-MLB-CCB** |
| **v.** | |
| **COMMISSIONER, SOCIAL** <br> **SECURITY ADMINISTRATION,** | **FINAL REPORT AND** <br> **RECOMMENDATION ON AN** <br> **APPEAL FROM A SOCIAL** <br> **SECURITY DISABILITY ACTION** |
| **Defendant.** | |

Plaintiff Michael A., Jr., brings this action under 42 U.S.C. § 405(g) to obtain judicial review of the final decision of the Commissioner of the Social Security Administration (the Commissioner), who denied Plaintiff's claim for supplemental security income. (Doc. 18-1 at 26–42). The action is now before the undersigned and is ripe for review. For the reasons set forth below, based on the administrative record and the briefs of the parties, the undersigned **RECOMMENDS** that the final decision of the Commissioner be **AFFIRMED**.

## I. PROCEDURAL HISTORY

Plaintiff filed an application for supplemental security income on March 24, 2016, alleging an onset date of disability of November 18, 2015. (Doc. 18-1 at 201). Plaintiff's applications were denied initially and on reconsideration, *id.* at 113–139,

and Plaintiff requested a hearing by an Administrative Law Judge (ALJ), *id.* at 155. The hearing was held on October 3, 2018. *Id.* at 89–112. The ALJ denied Plaintiff's application on March 18, 2019, finding that Plaintiff was not disabled from March 24, 2016, the date of the application. *Id.* at 42. On February 11, 2020, the Appeals Council of the Social Security Administration denied Plaintiff's request for review, making the ALJ's decision final. *Id.* at 5–10. Plaintiff filed this action on March 16, 2020. (Doc. 1).[1]

## II.    STANDARD FOR DETERMINING DISABILITY

An individual is "disabled" for purposes of disability benefits if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Any impairments must result from anatomical, psychological, or physiological abnormalities demonstrated by medically accepted clinical or laboratory diagnostic techniques, 42 U.S.C. §

---

[1] Plaintiff filed an application to proceed *in forma pauperis* on March 16, 2020. (Doc. 1). The Court granted the application on March 23, 2020, (Doc. 2), at which time the complaint was filed, (Doc. 3).

423(d)(3), and those impairments must prevent the claimant from substantial gainful work, 42 U.S.C. § 423(d)(2)(A).

To determine whether a claimant is disabled, the Commissioner must use a five-step sequential analysis:

(1)     Is the claimant currently working? If so, the claim is denied.

(2)     Is the claimed impairment severe; that is, does the impairment or combination of impairments significantly limit the individual's physical or mental ability to do basic work activities? If not, the claim is denied.

(3)     Does the impairment equal or exceed in severity certain impairments described in the impairment listings in the regulations? If so, the claimant is automatically entitled to disability benefits.

(4)     Does the claimant have sufficient residual functional capacity (RFC) to perform past work? If so, the claim is denied.

(5)     Considering the claimant's age, education, work experience, and RFC, can the claimant perform any other gainful and substantial work? If so, the claim is denied.

*See* 20 C.F.R. § 416.920. The "overall burden of demonstrating the existence of a disability as defined by the Social Security Act unquestionably rests with the

3

claimant," although the burdens temporarily shift at step five of the sequential analysis. *Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1359 (11th Cir. 2018) (internal quotation marks omitted). Specifically, at step five, "the burden of going forward shifts to the SSA to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform." *Id.* (internal quotation marks omitted). "If the SSA makes this showing, the burden shifts back to the claimant to prove she is unable to perform the jobs suggested by the SSA." *Id.* (internal quotation marks and alteration omitted). If the claimant satisfies that burden by showing that she is unable to perform the work suggested by the Commissioner because of her impairment, the ALJ will find that the claimant is disabled and entitled to benefits. *Id.*

Here, the ALJ found that Plaintiff was not under a disability from March 24, 2016, the date of the application. (Doc. 18-1 at 23–42). The ALJ made this determination at step five, finding that Plaintiff was capable of performing jobs that exist in significant numbers in the national economy—specifically, as a laundry classifier, a router, and a garment sorter. *Id.* at 41–42. On appeal, Plaintiff argues that the ALJ erred in weighing the opinions of Tildon Wright, a social worker, and Debbie Stevens, a nurse practitioner. (Doc. 25 at 14–22). The Court

4

sets forth the facts and findings of the ALJ below, with particular emphasis on those most relevant to the issues Plaintiff raises on appeal.

### III.   FACTS AND THE FINDINGS OF THE ALJ

The ALJ held a hearing on October 3, 2018, at which Plaintiff testified. (Doc. 18-1 at 89–112). Plaintiff made clear that the primary impairments that kept him from working related to his mental health. *Id.* at 94. He described hallucinations, flashbacks, and hearing voices. *Id.* at 94–95. He stated that he gets along with other people, except "when they come with their nonsense." *Id.* at 95–96. Plaintiff lives in transitional housing at the Imperial Hotel, *id.* at 93, where he has had confrontations with neighbors and staff after playing loud music to drown out the voices that he hears, *id.* at 95. Plaintiff stated that he is able to do household chores and grocery shopping. *Id.* at 106. The ALJ aptly described Plaintiff's testimony as "somewhat . . . rambl[ing]," although she noted that she was able to redirect him back to the matters at hand, and he responded to questions. *Id.* at 31.

The ALJ made the following findings:

1. The claimant has not engaged in substantial gainful activity since March 24, 2016, the application date (20 CFR 416.971 *et seq.*).

2. The claimant has the following severe impairments: hepatitis B infection; cataracts; status post right retinal detachment repair surgery (in 2011); a history of hernia repair (in 2015); depressive, bipolar and related disorder; and trauma- or stressor-related disorder (20 CFR 416.920(c)). . . .

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926). . . .

4. After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b), but he should not perform work tasks that require fine visual acuity. He should avoid exposure to unprotected heights and dangerous moving machinery. He could perform unskilled, simple, routine, repetitive work, but he should not perform fast-paced work tasks or work with high production quotas (e.g., factory or production work). He should not interact with the public, but he could have brief and superficial interaction with coworkers and supervisors. . . .

5. The claimant has no past relevant work (20 CFR 416.965).

6. The claimant was born on [date redacted], and was 46 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7. The claimant has a limited education and is able to communicate in English (20 CFR 416.964).

8. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969a). . . .

10. The claimant has not been under a disability, as defined in the Social Security Act, since March 24, 2016, the date the application was filed (20 CFR 416.920(g)).

(Doc. 18-1 at 28–42) (footnote omitted).

The ALJ detailed Plaintiff's mental health treatment records at length, including many notes and findings from social worker Tildon Wright and nurse practitioner Debbie Stevens. *Id.* at 34–37. Following the ALJ's extensive discussion of the records, she summarized the medical evidence this way:

> These treatment records show that claimant had recurring signs and symptoms of depressive, bipolar and related disorder and trauma- or stressor-related disorder, such as depressed, anxious, and irritable moods; visual hallucinations; rapid speech; psychomotor agitation or restlessness; poor sleep; flashbacks or nightmares; and one instance of short attention span. The treatment records show that the claimant's symptoms and signs improved with medication management, psychotherapy sessions, social worker management, coping techniques (e.g., breathing techniques and use of a stress ball). He had fluctuations in his symptoms and signs, though, and he sometimes had deterioration in his mental state when he stopped using medications, such as in June 2016. He also had improvement in his mental symptoms and signs when he resumed medication management on a consistent basis, which is evidence with the treatment notes a week after he resumed medication in June 2016. The treatment records also show that the claimant had increased symptoms when he had some unusual or irregular psychosocial stressors, such as an eviction action, conflict with his neighbors, or the deaths of family members. Despite the irregular psychosocial stressors that affected the claimant's moo[d] and psychomotor activity, the treatment notes show that the claimant maintained coherent thought process, judgment, insight, memory, and concentration.

> The treatment notes show that the claimant had difficulty interacting with others because of his mental symptoms. For example, when he tried to stop or control hallucinations by playing music loudly, he had conflicts with his neighbors. His hallucinations and reactions to them embarrassed him. However, at time when he reported active

hallucinations, such as in June 2016, the claimant also reported healthy interactions with friends and other individuals that he acknowledged as making him feel better. For example, in June 2016, the claimant reported he continued to hallucinate, but he also reported that he worked with male dancers on dance techniques or music, which reported as a "big help" for him. The claimant reported that he had difficulty interacting with his family members, and he did not attend two family members' funerals, including his stepmother's funeral, for this reason. Ms. Stevens often noted that the claimant was friendly despite his mood fluctuations, and he was cooperative. Thus, while the claimant continued to hallucinate and he had irritable, anxious, and depressed moods at time, he had fluctuations in his ability to interact with others, ranging from having conflicts with neighbors, almost mentoring young dancers, not attending family members' funerals, and attending a potluck dinner in his supporting housing at the Imperial Hotel.

Considering these signs and symptoms related to depressive, bipolar and related disorder and trauma- or stressor-related disorder, the conservative treatment history since the protective filing date, the positive effects of treatment, the claimant's eye and abdominal pain, and the visual flashes, glares and blurs, the treatment records indicate that the claimant had some limitations with understanding, remembering, carrying out complex tasks, concentrating on work tasks, and interacting with others constantly. However, the findings and symptoms documented in the treatment records do not entirely corroborate the claimant's allegations of mental symptoms and pain to the extent that they show that he could not perform any work activity on a consistent full-time basis. Accordingly, I restricted the claimant to light work with physical nonexertional limitations as previously discussed. He should not perform complex work tasks. Rather, the record indicates that his hallucinations, visual impairments, and mood symptoms caused difficulty concentrating upon work tasks such as that he should perform unskilled, simple, routine, repetitive work. The mental status findings of intact concentration, memory, thought process, insight, and judgment indicate that the claimant could perform these simple work tasks

rather than complex work tasks. However, because of the claimant's poor stress reactions, evidenced by his increased mood agitation when he had an eviction action filed against him in court, he should not perform fast-paced work tasks or work with high production quotas (e.g., factory or production work). As discussed, the claimant has demonstrated that he had some difficulty interacting with others because of hallucinations, psychosocial stressors, and mood fluctuations. However, the record also showed that [he] was able to engage with neighbors and others in the community at other times. He was able to adequately interact with his mental health care providers. As such, the claimant should not interact with the public, but he could have brief and superficial interaction with coworkers and supervisors.

(Doc. 18-1 at 37–38) (internal record citations omitted). The ALJ then offered this assessment of the opinions of nurse practitioner Debbie Stevens and social worker Tildon Wright:

As for the opinion evidence, I considered Ms. Stevens statements provided throughout her treatment of the claimant. She reported in September 2016 that the claimant was unable to work in any capacity and in January 2018 that he was unable to work because he had significant issues that caused difficulty securing employment. In December 2017, she completed a jury duty exemption form that he was permanently disabled. In October 2018, Ms. Stevens, claiming to be the claimant's physician and psychiatrist since 2015 (when she is actually a nurse practitioner and not a medical or osteopathic doctor and has not provided evidence that she is a licensed psychologist), completed a treating source statement in line with these prior statements. Ms. Stevens opined in October 2018 that the claimant had extreme limitation with understanding, remembering, or applying information; interacting with others; and concentrating, persisting, or maintaining pace; and marked limitation adapting or managing himself. For these reasons, she opined that he was not able to engage

in substantial gainful employment, yet he would be able to handle potential funds resulting from this claim.

I gave little weight to Ms. Stevens' opinions. Ms. Stevens' opinions are not persuasive because they are not consistent with or supported by the evidence. Ms. Stevens reported that the claimant had difficulty remembering instructions, focusing or concentrating upon work tasks, maintaining pace without unreasonable rest periods, poor memory, and psychosocial stressors. The claimant had intact memory and concentration except for October 2, 2018, when Ms. Steven[s] notes that the claimant had short attention span. She noted that he had psychomotor agitation and was restless, too, which I considered when I found he could not perform complex work but could perform simple, unskilled work tasks. As previously discussed, I considered his psychosocial stressors, but I also considered the evidence showing that he had some improvement in his social interactions with his neighbors and others in the community. Ms. Stevens noted unsubstantiated medication side effects as a reason for the claimant's limitations. I note that her own statement shows that side effects are hypothetical and do not demonstrate that the claimant had actual medication side effects. Moreover, the claimant denied medication side effects during treatment sessions. The record, including her own treatment notes and Mr. Wright's notes, does not support Ms. Stevens' opinion of marked and extreme mental limitations such that the claimant was unable to engage in simple work activity on a consistent basis. As previously discussed, the record demonstrates that the claimant had moderate mental limitations that restricted him to unskilled, simple, routine, repetitive work with pace and social interaction limitations as previously discussed.

In October 2018, Mr. Wright, the claimant's social worker, completed a statement. He worked with the claimant since 2015 by counseling him and helping him complete forms for this claim. Mr. Wright opined that the claimant had difficulty with social and occupational functioning, specifically, that the claimant was unable to work around others, had difficulty concentrating and focusing, and timely completing tasks. Mr. Wright also stated that the claimant's receipt of

supplemental security income payments would alleviate financial stressors that have exacerbated his symptoms.

I [gave] some weight to Mr. Wright's opinion that the claimant had difficulty interacting with other[s], concentrating and focusing on work tasks, and completing tasks timely. As previously discussed, the record supports that he had such limitations. However, the record, including Mr. Wright's and Ms. Stevens' treatment notes, does not support that the claimant's symptoms and signs had the intensity, persistence, and limiting effects to preclude him from performing even simple, unskilled work tasks. The treatment notes; statements about the claimant's social interactions with others; and his improvement with treatment such as medications and coping techniques that Mr. Wright acknowledged as helpful demonstrate that the claimant had moderate mental limitation and that he could perform unskilled, simple, routine, repetitive work as previously discussed.

. . .

In April 2016, Mr. Wright, assisting the claimant with his function report, noted that the claimant's physical problems contributed to his symptoms and caused increasing difficulty with consistently managing or maintaining quality of life. I gave some weight to this statement in the function report to the extent that it is an opinion of physical limitation. However, in the same report, Mr. Wright noted that the claimant completed his chores, shopped for himself, walked in the park, and attended church and health care appointments. The medical records show that the claimant had limitation relegating him to light work, and these reports do not demonstrate that he had greater functional limitation than provided in the residual functional capacity.

(Doc. 18-1 at 39–40) (internal record citations omitted).

11

All told, the ALJ found that Plaintiff was capable of performing jobs that exist in significant numbers in the national economy—including as a laundry classifier, router, and garment sorter. *Id.* at 41–42. As such, the ALJ determined that Plaintiff had not been under a disability and denied the claim for supplemental security income. *Id.* at 42.

## IV.   SCOPE OF JUDICIAL REVIEW

In reviewing the denial of Social Security disability benefits, this Court "must review the agency's decision and determine whether its conclusion, as a whole, was supported by substantial evidence in the record." *Washington*, 906 F.3d at 1358 (internal quotation marks omitted). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Mitchell v. Comm'r, Soc. Sec. Admin.*, 771 F.3d 780, 782 (11th Cir. 2014) (internal quotation marks omitted). Put differently, the Court "must decide whether on this record it would have been possible for a reasonable jury to reach the agency's conclusion." *Washington*, 906 F.3d at 1358 (internal quotation marks and alteration omitted). "In determining whether substantial evidence exists, [the Court] must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [Commissioner's]

decision." *Swindle v. Sullivan*, 914 F.2d 222, 225 (11th Cir. 1990) (internal quotation marks omitted).

The Court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011). Rather, the Court may only "determine whether the Commissioner's decision is supported by substantial evidence and based on proper legal standards." *Id.* (internal quotation marks omitted). Indeed, even if the evidence preponderates against the Commissioner's findings, this Court must affirm if the decision is supported by substantial evidence. *Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1260 (11th Cir. 2007). The Commissioner's findings of fact, therefore, if supported by substantial evidence, "shall be conclusive." *Washington*, 906 F.3d at 1358 (internal quotation marks omitted) (quoting 42 U.S.C. § 405(g)). The Court reviews whether the Commissioner's decision was based on a proper view of the law, on the other hand, *de novo. See id.* at 1358; *Tauber v. Barnhart*, 438 F. Supp. 2d 1366, 1372 (N.D. Ga. 2006) (noting that "[t]here is no presumption that the legal standard applied by the Commissioner was valid, or that it was properly applied" and that "the application of a wrong legal standard is grounds for remand").

13

## V.   DISCUSSION

As stated above, Plaintiff argues that the ALJ erred in weighing the opinions of Tildon Wright, a social worker, and Debbie Stevens, a nurse practitioner. (Doc. 25 at 14–22). Ms. Stevens opined that Plaintiff had extreme limitations in understanding, remembering, or applying information; interacting with others; concentration, persistence, and pace; and that he would not be able to sustain gainful employment. (Doc. 18-2 at 448–51, 453; *see also id.* at 269 (Ms. Stevens's opinion that Plaintiff will not "be able to work")). Mr. Wright opined that Plaintiff would be "unable to work with or around others." *Id.* at 454. The ALJ expressly considered both of these opinions, giving "little weight" to Ms. Stevens's opinions and "some weight" to those of Mr. Wright. (Doc. 18-1 at 39–40).

To begin, some explanation of what was required of the ALJ. "The regulations require the ALJ to evaluate every opinion of record and to explain the weight assigned to opinions from an 'acceptable medical source.'" *McGruder v. Astrue*, No. 1:11-CV-0468-JSA, 2012 WL 5817938, *6 (N.D. Ga. Nov. 16, 2012) (citing 20 C.F.R. §§ 404.1513(d), 416.927(b), (d)). And while the regulations generally establish "a hierarchy of medical evidence, entitling the opinions of treating physicians the greatest deference, followed by those of examining physicians, then non-examining physicians, and finally, other medical sources," *Gorham v. Astrue*,

14

No. 1:11-CV-3555-CAP-JSA, 2012 WL 5507306, at *4 (N.D. Ga. Nov. 14, 2012),[2] the Commissioner is required to "evaluate every medical opinion" it receives, 20 C.F.R. § 404.1527(c). Indeed, an ALJ must "state with particularity the weight given to different medical opinions and the reasons therefor." *Winschel*, 631 F.3d at 1179.

Mr. Tildon (a social worker) and Ms. Stevens (a nurse practitioner) are, in Social Security parlance, "other sources." But as noted above, an ALJ is required to consider evidence from "other sources," including medical sources who are not "acceptable medical sources," such as nurse practitioners, physician assistants, social workers, and therapists. *See* SSR 06-03p, 2006 WL 2329939, at *1, 4 (August 9, 2006)[3]; *see also Harrison v. Saul*, No. 8:20-cv-285-T-SPF, 2021 WL 926670, at *3–5 (M.D. Fla. Mar. 11, 2021) (explaining how SSR 06-03P requires an ALJ to consider opinions from "other source[s]"); *Adams v. Comm'r of Soc. Sec.*, No. 6:13-cv-1599-Orl-DAB, 2015 WL 1020559, at *9 (M.D. Fla. Mar. 6, 2015) (noting that an ALJ was

---

[2] The docket indicates that this Report and Recommendation was adopted by the District Judge on September 18, 2012. (Case No. 1:11-CV-3555-CAP, Doc. 16).

[3] When the Social Security Administration amended the regulations for evaluating medical opinions, the agency also rescinded SSR 06-03p as inconsistent with the new regulations. *See* Recission of Social Security Rulings 96-2p, 96-5p, and 06-03p, 2017 WL 3928298 (Mar. 27, 2017). That recission is only "effective for claims filed on or after March 27, 2017." *Id.* at *1. Because Plaintiff filed the disability application prior to that date, SSR 06-03p still applies.

required to consider the opinion of an "other source" but need not give it controlling weight). Simply put, SSR 06-03p directs the ALJ to "explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence . . . allows a claimant or subsequent reviewer to follow the adjudicator's reasoning." SSR 06-03p, 2006 WL 2329939, at *6. The ALJ did so here. (Doc. 18-1 at 39–40). Here, before the ALJ considered the opinions, she summarized the medical evidence—including treatment notes and observations from both Stevens and Wright—in considerable detail. For example, the ALJ noted:

- Mr. Wright's note that Plaintiff "had depressed and irritable moods, and . . . was agitated at times, such as in April 2016," *id.* at 34;

- Mr. Wright's note that Plaintiff had anxious affect, was worried about running out of his medication, but engaged in activities (like reading the Bible) that Plaintiff reported as helpful to his mental symptoms, *id.* at 35;

- Ms. Stevens's note that Plaintiff's symptoms worsened when he ran out of his medications, *id.*;

16

- Ms. Stevens's note that Plaintiff had aphasic but normal speech, depressed mood, and blunted affect, but had organized thought process and fair insight and judgment, *id.*;

- Treatment notes indicating that Plaintiff reported hallucinations, including seeing a man and a dog, *id.*;

- Mr. Wright's note that despite the hallucinations, low mood findings, and restless behavior, Plaintiff still had clear attention and consideration during a mental status exam, *id.*;

- Treatment notes reporting that Plaintiff inconsistently used his medication and had correlated worsening of mental symptoms, *id.*;

- Mr. Wright's note that claimant was visibly calm when compliant with medication, *id.*;

- Mr. Wright's note that Plaintiff reported increased social interactions with others, including that he painted, danced, and made music with friends as a social outlet, *id.*;

- Mr. Wright's note that these social activities were a big help to Plaintiff and made him feel good, *id.*;

- Mr. Wright's note of a normal mental status examination, *id.*;

- Ms. Stevens's note of improvement with use of medication, *id.*;

- Mr. Wright's note that Plaintiff was irritable and anxious after conflicts with neighbors, but that his mental status examinations were normal in subsequent sessions, *id.* at 36;

- Notes from both Mr. Wright and Ms. Stevens showing fluctuating mental symptoms, including that Plaintiff reported both hallucinating and not hallucinating, that his moods were good or depressed, that he denied suicidal ideations, and that he had intact thought processes, *id.*;

- November 2016 notes from Ms. Stevens that Plaintiff was doing well with medications, that he had no side effects, that he attended a potluck event at the Imperial Hotel with other residents, and that he did not want to spend the holidays with family, *id.*;

- January 2017 notes showing Plaintiff attended a new church, that he was coping better with his mental symptoms, that he slept well, that on exam he had excessive speech but normal mood and calm motor activity, *id.*;

18

- Ms. Steven's note that Plaintiff reported hallucinations but had normal concentration, intact memory, and organized thought, *id.*;

- Ms. Stevens's note from May of 2017 that Plaintiff was stable psychologically and had normal mental status examination findings, *id.*;

- April 2018 treatment notes from Ms. Stevens noting that Plaintiff reported ups and downs on a regular basis and did well on his medication, that he slept well but sometimes had difficulty sleeping, that he was more isolated, that he did not attend a family funeral because of family conflicts, that his speech was expansive but he had appropriate thought content with intact memory and concentration, *id.* at 37; and

- October 2018 treatment notes form Ms. Stevens noting that Plaintiff had rapid speech and increased psychomotor activity, a hyper mood, coherent thought process, no hallucinations, that he reported forgetting things, a short attention span, and good judgment and insight, *id.*

19

The ALJ then explained that she provided little weight to Ms. Stevens's opinions because they were, at times, inconsistent with the treatment records that the ALJ copiously summarized:

> I gave little weight to Ms. Stevens' opinions. Ms. Stevens' opinions are not persuasive because they are not consistent with or supported by the evidence. Ms. Stevens reported that the claimant had difficulty remembering instructions, focusing or concentrating upon work tasks, maintaining pace without unreasonable rest periods, poor memory, and psychosocial stressors. The claimant had intact memory and concentration except for October 2, 2018, when Ms. Steven[s] notes that the claimant had short attention span. She noted that he had psychomotor agitation and was restless, too, which I considered when I found he could not perform complex work but could perform simple, unskilled work tasks. As previously discussed, I considered his psychosocial stressors, but I also considered the evidence showing that he had some improvement in his social interactions with his neighbors and others in the community. Ms. Stevens noted unsubstantiated medication side effects as a reason for the claimant's limitations. I note that her own statement shows that side effects are hypothetical and do not demonstrate that the claimant had actual medication side effects. Moreover, the claimant denied medication side effects during treatment sessions. The record, including her own treatment notes and Mr. Wright's notes, does not support Ms. Stevens' opinion of marked and extreme mental limitations such that the claimant was unable to engage in simple work activity on a consistent basis. As previously discussed, the record demonstrates that the claimant had moderate mental limitations that restricted him to unskilled, simple, routine, repetitive work with pace and social interaction limitations as previously discussed.

(Doc. 18-1 at 39–40) (internal record citations omitted). The ALJ considered Ms. Stevens's opinion in detail, expressly afforded weight to those opinions, and

explained why she gave them the weight that she did—essentially, that there were numerous findings in the treatment notes inconsistent with both the extreme limitations Stevens suggested and her ultimate opinion that Plaintiff could not work. Nothing more was required. *See Howard v. Comm'r, Soc. Sec. Admin.*, 762 F. App'x 900, 904 (11th Cir. 2019) (finding substantial evidence in support of the ALJ's decision to reject the opinions of two examining physicians that were inconsistent with the doctors' own medical findings); *Bardge v. Berryhill*, 746 F. App'x 907, 909 (11th Cir. 2018) ("A medical opinion will often be given a greater weight if the medical opinion is fairly consistent with the record as a whole, and may be given lesser weight or rejected outright if the evidence supports a finding contrary to the medical opinion."); *Russell v. Astrue*, 331 F. App'x 678, 681–82 (11th Cir. 2009) (holding that an ALJ had good cause to afford little weight to the opinions of an examining physician that conflicted with the doctor's own examination, which revealed the plaintiff to be "normal" in nearly all respects); *Lucas v. Colvin*, No. 1:15-CV-2936-JFK, 2016 WL 4945347, at *7–8 (N.D. Ga. Sept. 16, 2016) (finding that an ALJ had good cause to reject the opinion of a treating doctor that was inconsistent with his own treatment notes and the rest of the record).[4]

---

[4] Plaintiff cites *Ernestine C. v. Comm'r, Soc. Sec. Admin.*, No. 1:18-CV-2979-ODE-CMS, 2019 WL 5410066, at *10–11 (N.D. Ga. Aug. 30, 2019), for the

This is a case where the treatment notes and medical evidence are, in layman's terms, a mixed bag. As detailed above and by the ALJ, there is real evidence of Plaintiff's mental health limitations (hallucinations, depressed mood, conflicts with neighbors, and rapid speech, for example) and real evidence of his ability to function well in spite of those limitations (normal mental status examinations, improvement with medication, social activities, appropriate thought content, and intact memory, for example). The ALJ discussed the good, the bad, and everything in between in significant detail, and she cogently explained why she rejected those portions of the opinions that were inconsistent with Ms. Stevens's and Mr. Wright's own observations and findings. Someone else might look at the evidence and reasonably come to a conclusion different than the one that the ALJ reached, but that is not what the Court is tasked with deciding.

---

proposition that normal mental status examinations "are not inconsistent with a treating source's ultimate conclusion that a person could sustain gainful employment." (Doc. 25 at 20). In *Ernestine C.*, the court noted that relatively normal findings from two appointments were not necessarily inconsistent with a doctor's ultimate conclusion that the plaintiff could not sustain gainful employment. 2019 WL 5410066, at *10–11. Here, in contrast, the ALJ relied on treatment notes from a much longer period of time, as well as findings that Plaintiff's symptoms improved with medication, therapy, and coping techniques, and that Plaintiff increasingly engaged in social activities. (Doc. 18-1 at 34–40). There is lots of medical evidence in this case that could cut both ways. The ALJ catalogued and analyzed it in detail and explained why she afforded lesser weight to some of the opinions of Ms. Stevens and Mr. Wright. That is all that is required.

Rather, the only question is whether the ALJ's assessment of Ms. Stevens's opinion is supported by substantial evidence, and it is.

The ALJ engaged in a similarly comprehensive analysis of Mr. Wright's opinions, explaining that she gave them only "some weight" because they were, in some instances, inconsistent with the treatment notes:

> I [gave] some weight to Mr. Wright's opinion that the claimant had difficulty interacting with other[s], concentrating and focusing on work tasks, and completing tasks timely. As previously discussed, the record supports that he had such limitations. However, the record, including Mr. Wright's and Ms. Stevens' treatment notes, does not support that the claimant's symptoms and signs had the intensity, persistence, and limiting effects to preclude him from performing even simple, unskilled work tasks. The treatment notes; statements about the claimant's social interactions with others; and his improvement with treatment such as medications and coping techniques that Mr. Wright acknowledged as helpful demonstrate that the claimant had moderate mental limitation and that he could perform unskilled, simple, routine, repetitive work as previously discussed.
>
> . . .
>
> In April 2016, Mr. Wright, assisting the claimant with his function report, noted that the claimant's physical problems contributed to his symptoms and caused increasing difficulty with consistently managing or maintaining quality of life. I gave some weight to this statement in the function report to the extent that it is an opinion of physical limitation. However, in the same report, Mr. Wright noted that the claimant completed his chores, shopped for himself, walked in the park, and attended church and health care appointments. The medical records show that the claimant had limitation relegating him

> to light work, and these reports do not demonstrate that he had greater functional limitation than provided in the residual functional capacity.

(Doc. 18-1 at 40). It is hard to imagine what more the ALJ could have done. She acknowledged Mr. Wright's opinion, gave it weight, and explained in detail why she afforded it the weight that she did—again, essentially because it was inconsistent with some of Mr. Wright's and Ms. Stevens's own treatment notes and observations. As with the opinions of Ms. Stevens, the ALJ did exactly what the regulations and caselaw require. *See Howard*, 762 F. App'x at 904; *Russell*, 331 F. App'x at 681–82; *Lucas*, 2016 WL 4945347, at *7–8.

Plaintiff argues that the opinions of Mr. Wright and Ms. Stevens "were worth greater weight." (Doc. 25 at 21–22). But it is not the Court's job to weigh the evidence *de novo* or decide how much weight it would have afforded the evidence in the first instance; rather, it may only "determine whether the Commissioner's decision is supported by substantial evidence and based on proper legal standards." *Winschel*, 631 F.3d at 1178 (internal quotation marks omitted). Here, there is ample evidence to support the ALJ's treatment of the opinions of Mr. Wright and Ms. Stevens.

Plaintiff argues that "[g]iving a narrative description of the evidence, 'some weight' to State agency opinions, and evaluating the Plaintiff's subjective

24

complaints is not enough to satisfy the substantial evidence standard" and that the ALJ should therefore have ordered a consultative examination "to complete the record." (Doc. 25 at 22). "The administrative law judge has a duty to develop the record where appropriate but is not required to order a consultative examination as long as the record contains sufficient evidence for the administrative law judge to make an informed decision." *Ingram*, 496 F.3d at 1269. Here there were extensive treatment records that the ALJ evaluated in the course of determining Plaintiff's RFC, and Plaintiff does not suggest what a consultative examination would have added to the record. The record contained ample evidence for the ALJ to properly evaluate Plaintiff's mental health, and the ALJ did not err by failing to order a consultative examination. *See, e.g.*, *Robinson v. Comm'r of Soc. Sec.*, 649 F. App'x 799, 802 (11th Cir. 2016) (holding that the ALJ did not err in failing to order a consultative examination where the ALJ's decision was supported by the plaintiff's activities of daily living, plaintiff's application for unemployment benefits, and plaintiff's numerous job applications); *Sarria v. Comm'r of Soc. Sec.*, 579 F. App'x 722, 724 (11th Cir. 2014) (holding that the ALJ did not err in failing to order a consultative examination where medical records, the reports of the plaintiff's treating psychiatrists and therapists, the assessments of agency physicians, and the plaintiff's self-assessments provided sufficient evidence for the

ALJ to determine whether the plaintiff's depression was disabling); *Castle v. Colvin*, 557 F. App'x 849, 853–54 (11th Cir. 2014) (holding that the ALJ did not err in declining to order a consultative examination where the record contained sufficient evidence—such as lack of treatment, the claimant denying musculoskeletal issues, and a doctor's release without work restrictions—to support the ALJ's decision).

Nor is this a case, as Plaintiff suggests, where the ALJ based the RFC finding on a lack of evidence or bare medical records that do not indicate exertional abilities. (Doc. 25 at 14–15). The treatment records from Ms. Stevens and Mr. Wright contain ample evidence that the ALJ was capable of interpreting and which bear directly on Plaintiff's ability to work, including, for example, about his ability to interact (and not interact) with others, Plaintiff's mood and affect, his memory, his thought process, his attention and concentration, and how his symptoms improved with medication. (Doc. 18-1 at 34–37). Plaintiff cites *McCommon v. Berryhill* (and other similar cases) for the proposition that "[c]ourts in this circuit have repeatedly held that the Commissioner's fifth-step burden cannot be met by a lack of evidence, but instead must be supported by the RFC assessment of a treating or examining physician." No. 1:16-CV-3379-TWT-CMS, 2018 WL 633888, at *9 (N.D. Ga. Jan. 2, 2018), *adopted by* 2018 WL 624881 (N.D. Ga. Jan. 30, 2018). To

26

the extent that the Plaintiff is arguing that the record is incomplete because the comprehensive medical evidence comes largely from a psychiatric nurse practitioner (who was responsible for managing Plaintiff's medication regimens) and a social worker—as opposed to a medical doctor—*McCommon* does not support that argument. The point of the cited statement in *McCommon* is that the Commissioner cannot meet its step-five burden based on a lack of evidence—not that the person writing the claimant's prescriptions and managing the treatment must be a doctor as opposed to a nurse practitioner. The ALJ's decision is supported by more than substantial evidence, and it should be affirmed.

## VI.   CONCLUSION

For the reasons set forth above, the undersigned **RECOMMENDS** that the Commissioner's final decision be **AFFIRMED**.

This is a Final Report and Recommendation, there is nothing further pending in this action, and the Clerk is **DIRECTED** to terminate the reference of this matter to the undersigned.

**IT IS SO RECOMMENDED,** this 30th day of July, 2021.

_____

CHRISTOPHER C. BLY
UNITED STATES MAGISTRATE JUDGE

27